# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

Patrick James Frasier,            ) C/A No.: 9:12-1947-DCN-BM
                                   )
                 Plaintiff,       )
                                   )
vs.                                  )
                                 ) **Report and Recommendation**
Carolyn W. Colvin, Acting Commissioner    )
of the Social Security Administration,      )
                                 )
                     Defendant.      )
_____ )

        The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. §405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

        Plaintiff applied for Disability Insurance Benefits (DIB) on May 14, 2009, alleging disability beginning May 20, 2008 due to "back pain, pain in both knees, and depression." (R.pp. 68, 357). Plaintiff's claim was denied initially and upon reconsideration. (R.pp. 69-71). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 15, 2010. (R.p. 42). At the hearing, Plaintiff amended his disability onset date to February 15, 2009. (R.p. 46). The ALJ thereafter denied Plaintiff's claim in a decision issued December 17, 2010. (R.pp. 75-92). Plaintiff requested that the Appeals Council review the decision, and in an order dated July 25, 2011, the Appeals Council remanded Plaintiff's case to the ALJ "[b]ecause the decision's residual functional capacity finding d[id] not include any social functioning restrictions, [and] the



1

finding appear[ed] deficient in light of Social Security Ruling 85-16 that states 'all limits on work-related activities resulting from a mental impairment must be described in the mental RFC assessment.'" (R.p. 95.) The Appeals Council's remand order directed that the ALJ:

> obtain updated evidence concerning claimant's impairments [in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence (20 CFR 404.1512-1513). Additional evidence may include], if warranted and available, a consultative examination with psychological testing and medical source statements about what the [Plaintiff] can still do despite his impairments. Further, [give further] consider[ation to] the [Plaintiff's] maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations [(20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p)], specifically [the ALJ should incorporate] all appropriate functional limitations stemming from the [Plaintiff's] mental impairment. Also, if warranted [by the expanded record], obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the [Plaintiff's] occupational base.

R.p. 11; see also R.pp. 95-96[1]

     The ALJ held a second hearing on January 3, 2012, again hearing testimony from Plaintiff and a vocational expert ("VE"). (R.pp. 31-41). Plaintiff's alleged onset date of disability continued to be February 15, 2009. (R.pp. 34-35, 46). The ALJ issued a new decision on January 26, 2012, again finding that Plaintiff was not disabled. (R.pp. 11-30). Plaintiff again requested review by the Appeals Council, which was denied by letter dated May 10, 2012. (R.p.1). The Appeals Council's denial of Plaintiff's request for review made the January 26, 2012 determination of the ALJ the final decision of the Commissioner.

---

[1] In the interim, Plaintiff had filed another application for benefits on February 17, 2011, which was denied on June 22, 2011. (R.pp. 93, 96; see also R.p. 404-15). The Appeals Council's action rendered Plaintiff's subsequent claim duplicate, so the remand order also directed the ALJ to "associate the claim files and issue a new decision on the associated claim." (R.p. 96).



Plaintiff then filed this action in this United States District Court, asserting that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## SCOPE OF REVIEW

Under 42 U.S.C. §405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F. 2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgement for that of the Commissioner. <u>Laws</u>, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).

3



**<u>DISCUSSION</u>**

A review of the record shows that Plaintiff, who was only thirty-four (34) years old on his amended disability onset date, has at least a high school education with past relevant work experience as a truck driver, diesel mechanic, and material handler. (R.p. 20). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in substantial gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for twelve (12) consecutive months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of obesity, status post gunshot wound, degenerative joint disease, and mood disorder, he nevertheless retained the residual functional capacity ("RFC") to perform a reduced range of sedentary work, and was therefore not entitled to disability benefits. (R.pp. 13, 15).

Plaintiff asserts that in reaching this decision, the ALJ erred by doing very little updating of his findings from the first hearing and by failing to comply with the Appeals Council's order, because his second decision does not demonstrate that he considered the evidence generated after the first hearing to any meaningful extent. Additionally, Plaintiff argues that the ALJ's RFC findings are not properly discussed and are not connected to the entire record, that the ALJ improperly assessed Plaintiff's subjective complaints of pain, and that the ALJ failed to determine whether the jobs suggested by the Vocational Expert ("VE") are compatible with Plaintiff's mild to

---

[2] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. <u>See</u> 20 C.F.R. §404.1521(a); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142 (1987).



moderate difficulties in concentration, persistence, and pace. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed.

### Medical Evidence

As noted above, at his ALJ hearing, Plaintiff amended his alleged disability onset date from May 20, 2008, to February 15, 2009. The case file includes the records of medical professionals who encountered Plaintiff in diagnostic, treating, consultative, and evaluative settings. During the period of time immediately before and subsequent to Plaintiff's alleged disability onset date, Plaintiff was treated primarily by St. James-Santee Family Health, Georgetown County Memorial Hospital, Waccamaw Mental Health Center, and the Lighthouse Care Center of Conway. Plaintiff also had limited treatment encounters with Carolina Orthopaedic Specialists and Coastal Eye Group.

Six different medical professionals gave opinions regarding Plaintiff's functioning during his alleged period of disability.[3] State agency physician Katrina Doig, M.D., reviewed Plaintiff's records and offered her opinion twice, first in 2009, (R.p. 642-48), and again in 2011, after she had viewed updated medical records, (R.p. 809-15). Dr. Doig's opinion addressed Plaintiff's physical condition. In 2009, she opined that Plaintiff could perform light work with some postural limitations. (R.p. 642-43). In 2011, she revised her opinion to state that Plaintiff could perform

---

[3] There also are other opinions in the record predating Plaintiff's alleged disability onset date. One is from James Turek, M.D., who examined Plaintiff in September 2005. (See R.p. 501-03). The ALJ noted that this opinion was "essentially irrelevant," as it was from several years before Plaintiff's alleged onset of disability, at a time when Plaintiff was still working. (R.p. 19). There are also two opinions from William Cain, M.D. (See R.p. 507-13, 576-90).



sedentary work with some postural limitations, with the 2011 postural limitations generally more extreme than those found in 2009. (R.p. 809-10). In her 2011 opinion, Dr. Doig also stated that Plaintiff should avoid all exposure to hazards such as machinery and heights, (R.p. 812), and would need a cane for walking, (R.p. 809).

State agency physicians Olin Hamrick, Ph.D., Lisa Clausen, Ph.D., and Lisa Varner, Ph.D., reviewed Plaintiff's records and provided opinions in 2009, 2010, and 2011, respectively, as to Plaintiff's mental capabilities. Both Dr. Hamrick and Dr. Varner believed that Plaintiff's mental impairment did not significantly limit his mental ability to do basic work activities. (R.p.649, 774). Dr. Clausen found Plaintiff's psychological impairment to be severe, but believed that he was still mentally capable of simple work, although Plaintiff "may not be suited for work with the general public." (R.p. 704, 708).

Deborah Tyler, Ph.D., an examining psychologist, also offered an opinion following her examination of the Plaintiff in February 2010. (R.pp. 674-678). However, as discussed below, she found it "difficult to assess [Plaintiff]'s psychological makeup because he was nonresponsive to most of the questions [she asked] and there was minimal historical information provided." (R.p. 677). Her opinion regarding Plaintiff's mental functioning was that he would likely "make poor social, personal, and occupational adjustments based on his response to the mental status examination," even though she acknowledged that Plaintiff's "reliability is nil or extremely poor . . . ." (R.pp. 674, 677). Even though Dr. Tyler is a psychologist and performed no physical examination of the Plaintiff, she further opined that "[i]t is difficult to see him performing any kind of physical work. . . . [H]e is extremely obese and he is physically handicapped in his back and his knees, he would not be able to perform work-related functions." (R.p. 677).



The sole medical professional opinion from anyone who had a treatment relationship with Plaintiff is from Jane Cooper, a nurse practitioner at the St. James-Santee Family Health Center, which was where Plaintiff received most of his medical care.[4] In March 2011, Ms. Cooper stated that Plaintiff's mood disorder caused slowed thought processes and a depressed mood. (R.p. 759). However, he was fully oriented, had appropriate thought content, adequate attention, and a good memory. Id. Ultimately, Ms. Cooper opined that Plaintiff's mental condition posed only slight work-related limitations on functioning. (R.p. 759).

The record also reflects that Plaintiff suffered a gunshot wound in April 1994, fifteen (15) years prior to his allegedly becoming disabled. He was shot once in the chest with a .25 caliber pistol. (R.p. 52-53). The bullet was never removed from his body, and Plaintiff alleges that the bullet remaining in his body has caused him significant back pain. Id.; e.g. R.p. 501.[5] Nevertheless, after Plaintiff's initial treatment for the gunshot wound, Plaintiff returned to work, id., and continued to work at various jobs, including as an auto and diesel technician, forklift operator, and truck driver, until February 15, 2009. (See R.p. 46, 431). In 2006, a CT scan showed that the bullet had lodged in the soft tissue surrounding Plaintiff's spine in his lower back. (R.p. 522). Imaging in 2010, however, showed that the bullet was no longer near his spine. It had migrated to the right buttock

---

[4] It does not appear that Ms. Cooper saw Plaintiff every time he went to his primary care provider, but she did see him regularly from 2009 through 2011. (See R.p. 666-68, 721-25, 761, 788, 804). Plaintiff was also treated there by Alfred Daniels, M.D. (See R.p. 828).

[5] Plaintiff previously submitted applications for DIB alleging disability due to this gunshot wound on July 20, 2005 and January 18, 2008. In those applications, Plaintiff attributed his disabling back pain to the effects of the gunshot wound to his chest on April 17, 1994, which Plaintiff alleged resulted in a "bullet in back spinal nerves in back [which] is affecting right leg and also affecting heart." (R.pp. 347, 304). These previous applications were denied on November 1, 2005 and on March 20, 2008, respectively. (R.p. 59-65).



area. (R.p. 683). This imaging also showed only "minimal . . . disc narrowing" and "mild degenerative facet changes," and was otherwise normal. Id. Nonetheless, Plaintiff alleges that chronic pain in his knees and back "limits [him] from everything" and has him "not wanting to do anything." (R.p. 394). Plaintiff rates his usual pain somewhere between a six and an eight on a ten-point scale, (see R.p. 35, 47), and states that walking, sitting, and standing all make the pain worse. See (R.p. 36, 48-49, 52). Plaintiff also asserts that he has a mood disorder that limits his interaction with other people and makes him "tired a lot." (R.p. 37). Additionally, Plaintiff is extremely obese. (R.p. 648, 674).

As with his back pain, Plaintiff's knee pain predates his alleged onset of disability. He has complained of pain in both knees since at least July 2007, (R.p. 640), although his primary complaint is his left knee. See, e.g., (R.p. 638, 680). As with Plaintiff's back, however, imaging of Plaintiff's knee is mostly unremarkable. In August 2008 he had "some mild degenerative osteoarthritis" in his left knee, but no acute injury. (R.p. 613). In November 2008, imaging was "overall fairly unremarkable" except for some "small fluid collection." (R.p. 620). In May 2011, there was "very minimal degenerative joint space narrowing," but normal alignment and mineralization and no fracture or joint effusion. (R.p. 802). Examinations also generally showed that, despite his complaints of pain, Plaintiff's knee was stable, unswollen, and retained a full range of motion and full strength. (See R.p. 593, 624, 799, 828; accord R.p. 746). Plaintiff was also able to walk without an assistive device and with a normal gait, sometimes, (R.p. 681), although Plaintiff had an unprescribed cane at the first hearing, (R.p. 46-47), and some treatment records record him using an unprescribed cane. See (R.p. 722); see also (R.p. 721) (noting Plaintiff walks with cane "but does not struggle").

8



Plaintiff's course of treatment for his physical ailments generally involved using various medications to ease his pain, including injections of Lidocaine and Depo-Medrol, a Fentanyl patch, and oral medications such as Vicodin and Naprosyn. (See R.p. 639, 667, 828). It was also suggested that Plaintiff should exercise more. (R.p. 573, 667). However, Plaintiff's treatment records reflect only intermittent care, and that he cancelled or failed to appear for several appointments. (R.p. 634, 666).

In comparison to his physical complaints, Plaintiff's mood disorder is of more recent origin. It appears that Plaintiff first complained of depression in May 2009. (See R.p. 669). He was initially treated with Celexa by his primary care provider. (R.p. 668). Although this antidepressant medication did not take effect immediately, id., by September 2009, Plaintiff was "more alert [and] less moody." (R.p. 667). However, Plaintiff stopped taking his antidepressant medication during the Summer of 2009. (R.p. 725). During his examination by Dr. Tyler in February 2010, as noted above, Plaintiff was mostly uncooperative and did not respond to the majority of the questions posed to him or cooperate in any testing. (R.p. 674, 676). While Plaintiff appeared to be very depressed, which Dr. Tyler thought was understandable, she still noted that, "[a]s depressed as he may be, his depression [did] not explain his declining to respond to the questions." Id. However, notwithstanding this lack of cooperation and her own statement that his reliability was "nil", Dr. Tyler gave Plaintiff a global assessment of functioning ("GAF") score of 50.[6] (R.pp. 674, 678).

_____

[6] A GAF score records a "clinician's judgement of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000) [hereinafter DSM IV-TR]. A score between 41 and 50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."



The record further reflects that Plaintiff did not seek specialized psychological care until March 1, 2010 (over a year after Plaintiff alleges he became disabled), when he visited the Waccamaw Mental Health Center ("WMHC") with complaints of depression with suicidal and homicidal ideation in the past, though not at that time.[7] (R.p. 727-29, 731). Plaintiff was given a GAF score of 55[8] and received counseling, but was not prescribed medication. (See R.p. 727-36). Plaintiff returned to WMHC in late May 2010, at which point he appeared extremely angry and was talking of hurting someone, following which he was admitted to a mental hospital, the Lighthouse Care Center of Conway, for five days. (R.pp. 737, 745). During his hospitalization, Plaintiff "made tremendous progress." (R.p. 747). He was placed on antidepressant and anti-anxiety medications, which he had apparently not been taking since the summer of 2009. See (R.p. 725 [noting Plaintiff stopped taking antidepressant medication in summer 2009]; R.p. 727 [noting no current mental health medications in March 2010]; R.p. 737 [noting no current mental health medications at time of commitment]). Plaintiff was assigned a GAF of 60 at his discharge. (R.p. 747).

Plaintiff then received follow-up treatment from WMHC in June and September 2010. At his June appointment, Plaintiff's GAF was 75.[9] (R.p. 740). In September, 2010, Plaintiff reported that he had stopped taking his anti-anxiety medication, Propranolol, and his GAF was assessed at

---

[7] Plaintiff's primary care provider initially referred Plaintiff to the mental health specialists at WMHC in December 2009. (R.p. 666). However, WMHC was never able to contact him. (R.p. 725).

[8] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM IV-TR 34.

[9] A GAF score between 71 and 80 represents symptoms that "are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument)" and "no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM IV-TR 34.



85.[10] (R.pp. 742-743). The doctor noted that Plaintiff's psychological condition was stable on medication, and she referred Plaintiff back to his primary care provider for medication management. Id. Thereafter, Plaintiff did not receive any significant mental health treatment until the Fall of 2011.

In October 2011, Plaintiff told his primary care provider that he had anxiety and was "[s]till experiencing a little depression," (R.p. 824), and in November 2011 he returned to WMHC for a psychological assessment. (R.p. 816). Plaintiff told WMHC that he had not had suicidal thoughts for the past year and did not have any current homicidal ideation. Id. The counselor at WMHC recorded that Plaintiff was experiencing "symptoms of depression and hopelessness in response to no longer being able to work as [a] truck driver" and "could benefit from cognitive behavioral therapy." (R.p. 820). Plaintiff's GAF score at that time was 59.[11]

### RFC Determination

After a review and consideration of the medical record in this case as well as the testimony of Plaintiff and the VE, the ALJ determined that, notwithstanding Plaintiff's severe impairments of obesity, status post gunshot wound, degenerative joint disease, and mood disorder, Plaintiff retained the RFC to perform a reduced range of sedentary work. Specifically, the ALJ found that Plaintiff is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. Plaintiff cannot climb, crawl, balance,

---

[10] A GAF score between 81 and 90 represents "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." DSM IV-TR 34.

[11] Plaintiff was scheduled for follow-up treatment, (R.p. 820), but it not clear if he actually attended, because there are no further records from WMHC in the case file. Later records from Plaintiff's primary care provider, St. James-Santee Family Health, refer only to Plaintiff's physical complaints. (R.p. 821-22).



or be exposed to industrial hazards. He may occasionally crouch or stoop. Plaintiff must work in a low stress setting, defined as requiring no more than occasional decision-making or changes in setting, and is restricted from any exposure to the general public. (R.p. 15).

### Plaintiff's Assertions of Error

### I.

Plaintiff first argues that the ALJ did very little to update his findings from the first hearing, and failed to comply with the Appeals Council's remand order, because the ALJ's second decision does not demonstrate that he considered, to any meaningful extent, evidence generated after the first hearing. Plaintiff also argues that in discussing Plaintiff's impairments, the ALJ relies almost entirely on the consultative examination performed by Dr. Tyler on February 18, 2010, prior to the first hearing. The Commissioner argues that the evidence as a whole supports the ALJ's decision that Plaintiff is not disabled and that the ALJ appropriately discussed the consultative psychological examination of Dr. Tyler, which was the only medical professional's opinion in the case to suggest that Plaintiff is unable to perform any work. The undersigned agrees.

As noted, Dr. Tyler's report stated that "it [was] difficult to assess [Plaintiff's] capabilities because he did not really exert himself during the mental status examination, but it is difficult to see him performing any kind of physical work," and "it would be very difficult for [Plaintiff] to work at this time for a variety of reasons specified above and other possible unknown factors." (See R.p. 677-78). The ALJ gave Dr. Tyler's opinion little weight, finding that, in addition to the fact that a physical assessment was beyond the scope of her expertise and was offered without the benefit of a physical examination, Dr. Tyler herself stated that it was difficult for her to assess



Plaintiff's psychological makeup due to the poor reliability of the exam and Plaintiff's non-responsiveness to questions. (R.pp. 19, 674, 678).[12]

In contrast to Dr. Tyler being a psychologist who did not even perform a physical examination, the ALJ noted that the state agency physician who reviewed Plaintiff's records, Dr. Doig, thought that Plaintiff could perform at least a limited range of sedentary work. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner]. In fact, Dr. Doig opined that Plaintiff could do even more, physically, than the ALJ found. (R.p. 642-43, 809-10). See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]. Furthermore, with respect to Plaintiff's mental status, Dr. Tyler herself noted the unreliability of any findings, and also observed that Plaintiff's "depression does not explain his declining to respond to the questions," and that "he [had] no history of major mental illness that would make him psychiatrically unable to respond to simple questions about his life and that the choice on his part has to be assumed to be an adaptive style." (R.p. 677). The ALJ also noted that three other psychologists and a nurse practitioner all thought Plaintiff was mentally capable of at least the level of mental activity assigned by the ALJ in the decision. (See R.p. 649, 708, 759, 774). See generally 20 C.F.R. § 404.1527 (2012) [setting standards for evaluation of opinion evidence].

Additionally, and again contrary to Dr. Tyler's conclusory and unsupported opinion, the objective medical evidence shows that Plaintiff's knee and back had only mild degenerative

---

[12] Plaintiff does not directly challenge the ALJ's finding that Dr. Tyler's opinion is entitled to little weight because it is conclusory and based on very little objective evidence. (R.p. 19).



changes; (see R.p. 522, 613, 620, 683, 802); and that when Plaintiff was compliant with his mental health treatment; i.e., when he was taking his prescribed medication, his psychological symptoms were not particularly limiting. This conclusion is supported by the fact that Plaintiff's lower GAF scores came when he was not on medication; (see R.p. 678, 728, 747); while Plaintiff's scores reflected only moderate symptoms, at worst, when Plaintiff took his medication. (See R.p. 743, 747, 820; see also R.p. 667) [noting that Plaintiff was "more alert [and] less moody" on medication]. See c.f. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [condition is not disabling if reasonably controlled by medication or treatment]. These medical records and the opinions of the state agency physicians provide substantial evidence to support the conclusions of the ALJ that Plaintiff's mental impairment resulted in no more than mild to moderate limitations in his activities of daily living, social functioning, and with regard to concentration, persistence and pace, while his physical impairment still allowed for the performance of a reduced range of sedentary work activities. (R.pp. 14-15). Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

Plaintiff also argues that in reaching his decision the ALJ ignored treatment notes from Plaintiff's primary care physician at St. James Santee, (Exhibits 32F, 34F, 38F, and 41F, R.p. 758-73, 788-89, 803-07, 821-28 ), and failed to mention Plaintiff's week-long hospitalization in 2010 at Lighthouse Care Center. (R.p. 714-719, 744-757). Plaintiff also complains that a listing of the cited exhibits in the ALJ's discussion of the combined effect of Plaintiff's multiple impairments reveals that most of the evidence was generated prior to the first hearing, noting that Exhibits 14F, 15F, 22F, 31F were all part of the record in the first hearing. However, Plaintiff's claim is not that he has become disabled since the first hearing. Rather, even with his now amended disability onset



date, his claim of disability predates his previous hearing by almost two (2) years. Therefore, it was

incumbent on the ALJ to review all of the evidence in reaching a decision on Plaintiff's case, not just

any evidence that post-dated the first decision. [13] <u>Mickles v. Shalala</u>, 29 F.3d 918, 925-926 (4th Cir.

1994)[In assessing the credibility of the severity of reported subjective complaints, consideration

must be given to the entire record, including the objective and subjective evidence].

Further, while Plaintiff's previous decision had been rendered using that earlier

evidence, that decision was reversed with an order of remand. Therefore, any review of Plaintiff's

claim by necessity had to include a review of that prior evidence. Cf. <u>Hancock v. Barnhart</u>, 206

F.Supp.2d 757, 763-764 (W.D.Va. 2002) [on remand, the ALJ's prior decision has no preclusive

effect, as it is vacated and the new hearing is conducted *de novo*]. Additionally, since each ALJ

---

[13] Indeed, Plaintiff's treatment at the Lighthouse Care Center, to which Plaintiff cites in support of his claim, took place *before* the first ALJ hearing. Moreover, Plaintiff's diagnosis, condition on discharge, and recommendations for follow-up upon his discharge from the Lighthouse in June 2010, do not establish a disabling condition, as follows:

> He is not suicidal. He is not homicidal. He has made tremendous progress. His mood is brighter. He has learned how to cope with the current stressor of his Disability being denied and his financial stressors. He is stable for discharge and will be discharged on 06/01/2010 with appropriate outpatient follow-up.

> Diagnosis: Major depressive disorder, recurrent. Hypertension, diabetes, chronic back problems, status post gunshot wound to the back and obesity. Financial stressors, unemployment and also Disability denial stressor. GAF at the time hospitalization was 40, current GAF is about 60.

> The patient is stable for discharge. He is not suicidal. He is not homicidal. He regretted ever making homicidal threats toward the person who shot him about 15 years ago. He is stable for discharge and he can be followed on an outpatient at Waccamaw Mental Health Center in Georgetown. He had no adverse reactions and no complications.

(R.p. 747).



decision is determined de novo, the ALJ was free to take any action on remand that did not conflict with the Appeals Council's remand order.  20 C.F.R. § 404.977(b) (2012).  See also Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)].  Here, the remand order directed the ALJ to obtain updated evidence and VE testing as necessary, which the ALJ did.  However, in reaching his decision, the ALJ was still required to base that decision on *all* of the record and evidence. Mickles, 29 F.3d at 925-926 [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].

A review of the record shows that the ALJ considered evidence from both before and after the first hearing, and cited evidence from both hearings several times.  The ALJ's January 26, 2012 decision specifically cites to six of the ten newly added exhibits, i.e. Exhibits 31F, 32F, 37F, 40F, and 41F, and demonstrates that he considered the evidence that was generated after the first hearing.  (See R.pp. 15, 17, 18 and 19).  While Plaintiff complains that, in discussing Plaintiff's degenerative joint disease in his knee the ALJ focuses on objective findings in 2008, 2009 and 2010, the most recent objective finding, Plaintiff's x-ray of his left knee taken at Georgetown Memorial Hospital on May 26, 2011, also showed only "very minimal degenerative joint space narrowing," (R.p. 802), and is discussed in the ALJ's decision.  (See R.p. 18).  Plaintiff further complains that the ALJ failed to address Plaintiff's September 7, 2011, October 6, 2011 and December 5, 2011 treatment visits to St. James-Santee Family Health.  However, these medical records show that, while Plaintiff complained of chronic low back pain on September 7, he also complained of having been



in a motor vehicle accident two weeks before and, on a self-assessed patient health questionnaire, reported that the problems he sought treatment for that day only made it "somewhat difficult" for him to "do [his] work, take care of things at home, or get along with other people." (R.p. 827). With respect to October 6, 2011, the primary purpose of Plaintiff's office visit that day was "for levels LBP/HTN/anxiety flu visit." (R.pp. 18, 824).

   In sum, the medical record in this case was updated after the first hearing. Records and reports were requested from Plaintiff's medical and mental health treatment providers, examiners, and consultants, and their responses were added to the case record, designated as Exhibits 31F - 41F, R.pp. 744-828. Nothing that was added shows that Plaintiff is disabled, and the ALJ's decision addresses the additional evidence that required any comment. Cf. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir.1993) [" . . . the ALJ need not evaluate in writing every piece of testimony and evidence submitted. . . .What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]; see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1999) ['No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"]. Plaintiff's argument that the ALJ committed reversible error by not referring to every piece of the evidence is also not grounds for reversal, as there is no requirement that the ALJ discuss every piece of evidence in the record. Russell v. Chater, 60 F.3d 824, 1995 WL 417576 * 3 (4th Cir. 1995); Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citations omitted); accord Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) [ALJ's discussion of evidence need only be sufficient to



"assure [the court] that [he] considered the important evidence . . . [and to enable the court] to trace the path of [his] reasoning"].

Plaintiff's claim that the ALJ failed to adequately consider the evidence generated after the first hearing and relied too much on Dr. Tyler's consultative examination is without merit.

## II.

In making his findings, the ALJ also noted that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of the his symptoms - which could be expected from Plaintiff's medically determinable impairments - was not credible to the extent this testimony was inconsistent with the residual functional capacity assessment found in the decision. (R.p. 16). Plaintiff faults the ALJ's discussion of Plaintiff's credibility, arguing that the ALJ cites Plaintiff's noncompliance with medication in 2009 and Plaintiff's discontinuation of mental health treatment in 2010, but does not appear to consider the fact that Plaintiff resumed mental health treatment after the first hearing, in November 2011. However, ALJ's decision does discuss Plaintiff's November 2011 assessment, which showed that "upon evaluation at that time, [Plaintiff] reported that financial problems related to unemployment had caused him to lose his home. His GAF score was 58. He was reported to be cooperative throughout the evaluation and his mental status was normal on examination. [Plaintiff] stated that he was interested in getting the treatment that he needed." (R.p. 19). As to the claim that the ALJ did not consider Plaintiff resumption of mental health treatment in November 2011, the medical record indicates that Plaintiff was referred by the Social Security Administration for an updated mental health assessment on November 15, 2011, which was performed by Christopher B. Wells, M.Ed, who recommended that "[Plaintiff] could benefit from cognitive behavioral therapy" and that the "plan [was] for [Plaintiff] to see Dr. Christie for initial



PMA on 11/30/11 and for HTH to follow up with therapy." (R.pp. 19, 820). However, the medical records from Waccamaw Mental Health contain no evidence that Plaintiff ever received any additional mental health treatment following the assessment in November 2011.[14]

Plaintiff also complains that the ALJ's discussion of his subjective testimony "fixates on the notion that [Plaintiff] described a 1994 gunshot wound as the genesis of his problem," and that the ALJ's consideration of Plaintiff's gunshot wound focuses on evidence from 2006 and 2008, prior to Plaintiff's alleged disability onset date. However, notwithstanding the objective medical evidence and the diagnostic opinions of two examining and/or treating physicians, the record in this case shows that, as recently as Plaintiff's November 15, 2011 mental health assessment, Plaintiff once again "[r]eport[ed] that his back pain is related to being shot in the chest in 1994 during a fight and that his current situation is made worse by other health problems that include diabetes, hypertension and joint problems." (R.p. 816). Under these circumstances, the undersigned does not find it improper for the ALJ's decision to have included a discussion about Plaintiff's persistent "gunshot wound explanation" for his back pain in the context of the ALJ's credibility assessment of Plaintiff's testimony concerning his pain.

Plaintiff also asserts that in discussing Plaintiff's preoccupation with, or exaggeration of, his 1994 gunshot wound, the ALJ neglected to consider the corroborating evidence of Plaintiff's level of pain; i.e., Plaintiff's testimony that his daily activities are very limited, and that he worked despite his pain for as long as could until he could no longer persist. However, where a claimant

---

[14]  At the second ALJ hearing on January 3, 2012, when asked by the ALJ "Are you getting mental health treatments?," Plaintiff answered "I have another appointment on the 5th." (R.p. 37). Plaintiff did not indicate that he had had any appointments between November 15, 2011 and January 5, 2012.



seeks to rely on subjective evidence to prove pain, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record." See SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2, 1996); <u>Mickles</u>, 29 F.3d at 925-926 [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]; <u>see</u> <u>Craig v. Chater</u>, 76 F.3d 585, 595 (4th Cir. 1995) ["Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment."]. When objective evidence conflicts with a claimant's subjective statements, an ALJ is allowed to give the statements less weight; <u>see</u> SSR 96-7p, 1996 WL 374186, at *1 (1996); and after a review of the record and evidence in this case, the undersigned can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. See <u>Ables v. Astrue</u>, No. 10-3203, 2012 WL 967355 at *11 (D.S.C. Mar. 21, 2012) ["Factors in evaluation the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant.", citing to SSR 96-7p.].

First, as previously discussed, the objective evidence repeatedly showed that Plaintiff's physical condition was not of the severity that would cause the debilitating problems he alleged. See <u>Schultz v. Astrue</u>, 479 F.3d 979, 982–83 (8th Cir. 2007) ["Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work."]. Rather, imaging showed only minor degenerative changes, <u>e.g.</u>, (R.p. 613, 802), and Plaintiff generally retained a full range of motion and full strength. <u>e.g.</u>, (R.p. 593, 799). <u>See</u> 20 C.F.R. § 404.1529(c) (2012) [ALJ must consider objective medical evidence]; <u>Parris v. Heckler</u>, 733 F.2d 324,



327 (4th Cir. 1984) ["[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." (citation omitted)]. Second, the record reflected that Plaintiff missed doctor's appointments and was not always compliant with his treatment. See English v. Shalala, 10 F.3d 1080, 1084 (4th Cir. 1993) [failure to take prescribed medication, among other evidence, supports ALJ's finding of non-disability]. Third, the ALJ noted that when Plaintiff was compliant with treatment, his symptoms were minimal. See R.p. 743, 747, 820; Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [condition is not disabling if reasonably controlled by medication or treatment]; § 404.1529(c) [ALJ should consider effectiveness of treatment]. Fourth, the ALJ noted that "there is evidence that [Plaintiff] attended church and attempted to do chores around the house, activities that generally reveal functioning at a greater level than alleged." R.p. 16. See Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) [ALJ may consider whether claimant's activities are consistent with allegations]. Finally, the Commissioner notes that the ALJ's finding that Plaintiff is not disabled is supported by nearly every medical professional to consider the matter.

Based on this record and the evidence, the undersigned does not find that the ALJ conducted an improper credibility analysis in reaching his conclusions, or that the decision otherwise reflects a failure to properly consider the record and evidence in this case. Bowen, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]; Jolley v. Weinberger, 537 F. 2d 1179, 1181 (4th Cir. 1976) [finding that the objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"]; Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Anderson v. Barnhart, 344 F.3d 809, 815 [Evidence



that a claimant is exaggerating symptoms can be considered as part of the evaluation of Plaintiff's subjective complaints]. This argument is therefore without merit. <u>Thomas v. Celebreeze</u>, 331 F.2d 541, 543 [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-273 ["The substantial evidence standard presupposes . . . a zone of choice from which the decision makers can go either way without interference by the Court"].

### III.

Plaintiff also complains that the ALJ altered his RFC finding between the first and second decision by eliminating a sit/stand option because "records from the date of the prior decision, December 17, 2010, forward show the claimant was ambulatory, did not use an assistive device, had full range of motion of all extremities, and no joint tenderness." (R.p. 20). Plaintiff argues, however, that subsequent evidence supports, rather than detracts, from Plaintiff's need for a sit/stand option. Plaintiff argues that his visits to medical providers on May 23, 2011, September 7, 2011, October 6, 2011, December 5, 2011, substantiate his continuing chronic pain and difficulty bending his arms, lifting, standing, bathing and sleeping.[15] Moreover, Plaintiff argues the sit/stand option is generally given in the context of sedentary work, which involves mostly sitting, when claimants are unable to sit for long periods of time. Plaintiff argues that his ability to stand and ambulate is irrelevant, and that the ALJ did not demonstrate that his ability to sit for long periods of time had changed since the last decision. Plaintiff argues that it follows logically that the same RFC restrictions ought to have remained in place.

---

[15] This medical evidence, which was submitted after the first ALJ hearing, has previously been discussed in this Report, <u>supra</u>.



This argument is without merit on several grounds. First, as has previously been noted, the first decision was vacated, and the decision presently before the Court is a de novo determination without regard to the previous findings. Hancock, 206 F.Supp.2d at 763-764 [on remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo]. The ALJ was not bound by any prior RFC findings, and properly based his conclusions on the entire record before the court from the time period relevant to Plaintiff's application. See Gibbs v. Barnhart, 130 F. App'x 426, 430, 2005 WL 1052858 (11th Cir. 2005) ["Because the Appeals Council vacated the first ALJ's written decision with instructions for the ALJ to obtain and consider additional evidence, the specific findings contained in that first decision were never conclusively established and were subject to modification."]; Houston v. Sullivan, 895 F. 2d 1012 (5th Cir. 1989) [ALJ not bound to earlier decision, on remand]. Second, the ALJ provided specific reasons for why he eliminated the sit/stand option in his RFC finding in his January 26, 2012 decision. No medical assessment in the record expressly limited Plaintiff to alternating periods of sitting and standing, and all of the other credited medical assessments were specifically taken into account in the ALJ's determination of Plaintiff's RFC for a reduced range of sedentary work. Plaintiff provided no medical evidence to suggest that his use of a cane was ever prescribed (although it was at one point a recommendation), and the ALJ explicitly reduced Plaintiff's exertional level and provided for postural limitations in consideration of Plaintiff's weight, gunshot wound, and degenerative disease. Plaintiff was also restricted from exposure to hazards out of consideration for his medication side effects.

This argument is without merit.



# IV.

In terms of mental limitations, Plaintiff was limited to a low stress setting due to his mild to moderate limitations in concentration, persistence, and pace, and was also specifically restricted from exposure to the general public due to mild to moderate limitations in social functioning. (R.p. 20). The low stress work setting was further defined by the ALJ as one "requiring no more than occasional decision-making or changes in setting." (R.p. 15). These were appropriate restrictions given these RFC findings. Cf. <u>Smith-Felder v. Commissioner</u>, 103 F.Supp.2d 1011, 1014 (E.D.Mich. June 26, 2000) [hypothetical question including work involving only a mild amount of stress and only "simple one, two, or three step operations" properly comports with findings of ALJ as to plaintiff's moderate limitations in concentration, social functioning, and tolerance of stress]; <u>Wood v. Barnhart</u>, No. 05-432, 2006 WL 2583097 at * 11 (D.Del. Sept. 7, 2006) [By restricting plaintiff to jobs with simple instructions, the ALJ adequately accounted for plaintiff's moderate limitation in maintaining concentration, persistence or pace]; <u>Hyser v. Astrue</u>, No. 11-102, 2012 WL 951468 at * 6 (N.D.Ind. Mar. 20, 2012)[Finding limitation to jobs "involving only occasional contact with public and co-workers" accounted for moderate social functioning].

Moreover, the ALJ's decision demonstrates that he followed the instructions of the Appeals Council's remand order by incorporating appropriate findings based on the record as to functional limitations which stemmed from all aspects of Plaintiff's mental impairment. Specifically, the ALJ's RFC determination in the second hearing decision acknowledged these limitations and made the express findings outlined above. <u>See</u> (R.pp. 14-15). In doing so, the ALJ appropriately gave little weight to the February 2010 psychological consultative examination by Dr. Tyler. The ALJ also noted that subsequent records indicated that Plaintiff's appearance, speech, and behavior



were normal, and that while Plaintiff testified his medications caused side effects that impaired his ability to concentrate and focus, medical records described Plaintiff's memory, attention, and concentration as intact. (R.p. 14). The ALJ specifically noted that he "also considered whether the 'paragraph C' criteria [we]re satisfied," and "in this case, the evidence fail[ed] to establish the presence of the 'paragraph C' criteria." (R.p. 15). The ALJ emphasized that his Step 3 analysis was not an RFC assessment and that the mental RFC assessment at Steps 4 and 5 requires a more detailed assessment by itemizing various functions contained in the broad categories found in Listing 12.00. Id. Thus, the ALJ properly addressed Plaintiff's issues regarding concentration, persistence, and pace, at Steps 2 and 3 and dealt with them again, in a more specific manner, at Steps 4 and 5.

### V.

Finally, Plaintiff argues that the ALJ failed to determine whether the jobs suggested by the Vocational Expert ("VE") are compatible with Plaintiff's mild to moderate difficulties in concentration, persistence, and pace. Plaintiff maintains that the ALJ simply makes the unexplained leap from mild to moderate limitations in concentration to an assumption that Plaintiff's is capable of any kind of unskilled labor.

However, the ALJ did not find that the Plaintiff was capable of "any kind" of unskilled labor.[16] Rather, the ALJ's RFC finding specifically includes the restriction that "Plaintiff must work in a low stress setting, defined as requiring no more than occasional decision-making or changes in setting. He is restricted from any exposure to the general public." (R.p. 15). Then, at the hearing,

---

[16]Inexplicably, the Commissioner states in his brief that Plaintiff's mild to moderate limitations in concentration, persistence, and pace were not a part of the ALJ's RFC finding, and that the ALJ therefore had no duty to determine whether such limitations would prevent Plaintiff from doing any jobs. See Brief, p. 17. However, the ALJ's decision expressly indicates that his RFC finding *does* account for Plaintiff's mental limitations. See (R.p. 20).



the ALJ asked the vocational expert whether someone with these limitations could perform gainful employment, and the VE identified the jobs of assembler, quality control examiner, and hand packer as jobs Plaintiff could perform with these limitations. (R.pp. 39-40).

The ALJ's decision refers to the nine-digit occupational code numbers of each of these jobs as contained in the DOT.[17] and the Court may take judicial notice that the United States Department of Labor's online edition of the DOT's descriptive listing for each of these jobs is as follows: (1) fishing reel assembler - Code: 732.684-062; Strength: S; GED: R2 M1 L1; SVP: 2; (2) table worker (fabrication) - Code: 739.687-182; Strength: S; GED: R1 M1 L1; SVP: 2; (3) bander, hand (tobacco) - Code: 920.687-030; Strength: S; GED: R2 M1 L1; SVP: 2.[18] All three of these unskilled jobs have a GED rating of R1 or R2, indicating that the worker must "apply commonsense understanding to carry out simple one- or two-step instructions; deal with standardized situations with occasional or no variables in or from these situations encountered on the job" or "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions; deal with problems involving a few concrete variables in or from standardized situations." The mathematical and language development components of the GED rating for all three jobs are M1 and L1, indicating that the jobs require only the most basic skills on the DOT scale in these areas. See

---

[17]The Dictionary of Occupational Titles (DOT) is "a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002). "[T]he DOT, in its job description, represents approximate *maximum* requirements for each position rather than the range." See Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir. 1998).

[18]See Williams v. Long, 585 F. Supp. 2d 679, 685-89 (D. Md. 2008) (collecting cases in which courts have held that postings on government websites are inherently authentic or self-authenticating).



http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Aug. 2, 2013).[19]

The basic ability to carry out simple, one- or two-step instructions, or detailed, but uninvolved written or oral instructions, is compatible with Plaintiff's ability to work in a low stress setting, requiring no more than occasional decision-making or changes in setting, while restricted from any exposure to the general public, based on Plaintiff's mild to moderate limitations in concentration, persistence, and pace. See McDonald v. Astrue, 293 Fed. App'x 941, 946-47 (3d Cir. 2008) [noting that the ALJ properly accounted for his finding that the claimant had moderate limitations in concentration by limiting him to simple, routine tasks]; Monkes v. Astrue, 262 Fed. App'x 410, 412 (3d Cir. 2008) ["Having previously acknowledged that [the claimant] suffered moderate limitations in concentration, persistence and pace, the ALJ [properly] accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks.'"]; George v. Commissioner, 2013 WL 1136747 at *1 (W.D. Pa. March 18, 2013) [ALJ properly addressed claimant's moderate limitations in concentration, persistence, and pace by finding RFC for work requiring only simple instructions, which avoided direct face-to-face interactions with general public, crowds, groups of people, intensive supervision, close interaction with co-workers, and changes in work setting]; see also Sensing v. Astrue, No. 10-3084, 2012 WL 1016581 at * 7 (D.S.C. Mar. 26, 2012). Therefore, the ALJ's hypothetical question to the VE accounted for all

---

[19]Even if the fishing reel assembler job could be deemed inconsistent with Plaintiff's RFC based on that job's definition in the DOT arguably requiring more detailed assembly and testing requirements that could be considered low stress or only occasional decision-making, Plaintiff could still perform the two other jobs the ALJ identified. Thus, any error in finding Plaintiff could perform the assembler position, if such error is assumed, would be harmless. See Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ["reversal is not required when the alleged error clearly had no bearing on the . . . substance of the decision reached."].



credibly established medical findings in the record and as determined by the ALJ's RFC finding, and is not ground for reversal of the decision.  Lee v. Sullivan, 945 F.2d 687, 692 (4th Cir. 1991)[ALJ not required to include limitations or restrictions in his decision that he finds are not supported by the record].

### Conclusion

Substantial evidence is defined as ". . . evidence which a reasoning mind would accept as sufficient to support a particular conclusion."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  As previously noted, if the record contains substantial evidence to support the decision, i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury, this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period.  Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

October 24, 2013
Charleston, South Carolina



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

